UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHARLEEN TAYLOR                          CIVIL ACTION

VERSUS                                   NUMBER: 16-00731

CAROLYN W. COLVIN, ACTING                SECTION: "N"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 13, 16).

Charleen Taylor, Plaintiff herein, filed the subject application for DIB on May 2, 2013, alleging disability as of March 1, 2012.  (Tr. pp. 143-149)./[1]  In a "Disability Report-Adult" form that appears in the administrative record below, the condition limiting Plaintiff's ability to work was identified as a left knee replacement.  (Tr. pp. 164-171).  Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on August 20, 2013.  (Tr. pp. 86-89).  Pursuant to her request, a hearing *de novo* before an

---

[1]/ The administrative record contains a form denominated "Application Summary for Disability Insurance Benefits" that purports to contain a "... summary of [Plaintiff's] statements" that were allegedly made by her in the course of applying for such benefits over the phone on the noted date.  (Tr. pp. 143-149).  On the first page of that form, Plaintiff was reported as having advised the attending SSA representative that "no previous application [for DIB] ha[d] been filed with the Social Security Administration by or for [her]" but that she "ha[d] filed or intend[ed] to file for SSI" (i.e., Supplemental Security Income benefits).  (Tr. p. 143).  In that regard, a review of the record reveals that Plaintiff had filed a previous application for DIB on April 19, 2011, alleging disability as of March 14. 2009.  (Tr. pp. 36, 61).  That application was denied at the initial level of the Commissioner's administrative review process on June 17, 2011, at the Administrative Law Judge ("ALJ") level on March 1, 2012, and at the Appeals Council ("AC") level on April 4, 2012.  (Tr. pp. 36, 44, 161).

Administrative Law Judge ("ALJ") went forward on May 28, 2014, at which Plaintiff, who was represented by counsel, appeared and testified.  (Tr. pp. 90-91, 48-73).  On August 8, 2014, the ALJ issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 15-28).  The Appeals Council ("AC") subsequently denied Plaintiff's request of the ALJ's decision on December 11, 2015, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-5).  It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In her cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

> I.     The ALJ applied an improper legal standard by refusing to consider any evidence prior to March 1, 2012 and after 12/1/12, Plaintiff's date last insured (DLI).
>
> II.    The ALJ applied an improper legal standard by failing to properly consider whether Plaintiff met or equaled §§1.02(A) or 1.03 of the Listing of Impairments.  The ALJ's rationale at Step 3 includes gross misstatements of fact and is also reliant on irrelevant facts as well as a conclusory opinion.
>
> III.   The ALJ improperly discredited Plaintiff's testimony with respect to her non-exertional limitations as a consequence of pain and swelling.  His rationale includes gross misstatements of fact and additionally, lacks evidentiary support.

(Rec. doc. 13-3, p. 2).

Relevant to the issues to be decided by the Court are the following findings made by the ALJ:

> 1.     The claimant last met the insured status requirements of the Social Security Act on December 31, 2012.

2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 1, 2012 through her date last insured of December 31, 2012 (20 CFR 404.1571 *et seq.*).

3.   The relevant period at issue is from the claimant's alleged onset date of March 1, 2012 through her date last insured of December 31, 2012.

4.   From March 1, 2012 through the date last insured, the claimant had the following severe impairment:  status post left knee surgery (20 CFR 404.1520(c)).

5.   From March 1, 2012 through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

6.   After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform the full range of sedentary work as defined in 20 CFR 404.1567(a).

7.   Through the date last insured, the claimant was capable of performing past relevant work as a receptionist.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

8.   The claimant was not under a disability, as defined in the Social Security Act, at any time from March 1, 2012, the alleged onset date, through December 31, 2012, the date last insured (20 CFR 404.1520(f)).

(Tr. 20, 21, 22, 23, 24).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision and (2) whether the decision comports with relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d

3

1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not re-weigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1983). Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §404.1520 as follows:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

4

2.      An individual who does not have a "severe impairment" will not be found to be disabled;

3.      An individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4.      If an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made;

5.      If an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987). In determining whether a claimant is capable of performing the work that she has done in the past, the ALJ is required to assess the demands of the prior work and to compare those demands to the claimant's present capabilities. *Villa*, 895 F.2d at 1022; *Hollis v. Bowen*, 837 F.2d 1378, 1386 (5th Cir. 1988); *Epps v. Harris*, 624 F.2d 1267, 1274 (5th Cir. 1980). The assessment of the demands of a claimant's prior work "... may rest on descriptions of past work as actually performed or as generally performed in the national economy." *Villa*, 895 F.2d at 1022 (citing *Jones v. Bowen*, 829 F.2d 524, 527 n. 2 (5th Cir. 1987)). A finding that the claimant is or is not disabled at any point in the five-step review process is conclusive and terminates the Commissioner's analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

By way of background and as noted earlier, Plaintiff underwent a left total knee arthroplasty (*i.e.*, replacement) on June 8, 2010 after a course of conservative care failed to

alleviate her symptoms. (Tr. 243-248). Plaintiff was discharged home in good condition on June 12, 2010 after "progress[ing] very well" in her post-operative care regimen. (Tr. pp. 235-236). It was that surgical procedure and its outcome that formed the basis of Plaintiff's previous application for DIB that was denied by an ALJ on March 1, 2012, the alleged onset date that Plaintiff identifies in her present application. (Tr. pp. 36-44, 143-149). As a consequence of that previous unsuccessful application, the doctrine of administrative *res judicata* precludes the Court from considering Plaintiff's entitlement to DIB prior to the date of that adverse adjudication. *Califano v. Sanders*, 430 U.S. 99, 107-09, 97 S.Ct. 980, 985-86 (1977); *Muse v. Sullivan*, 925 F.2d 785, 787 n. 1 (5th Cir. 1991). What is also clear is that Plaintiff's insured status and resulting entitlement to DIB expired on December 31, 2012. (Tr. pp. 18, 20). That being the case, Plaintiff bore the burden of establishing that she suffered from a disabling condition before the expiration of her insured status. *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990)(citing *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)). For a claimant to demonstrate that she is entitled to DIB, she must prove not only that she is disabled but that she became disabled prior to the expiration of her insured status. *Anthony*, 954 F.2d at 295. "Any impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

The medical evidence that was generated during the relevant time period begins with a treatment note from the Ochsner Medical Center-Kenner ("OMC-K") where Plaintiff was seen by Dr. Shannon Starr on March 21, 2012. Unfortunately, the note is largely illegible except to document that Plaintiff's chief complaint at the time was left knee pain, rated at a level of "9," and that the assessment was status post left total knee arthroplasty for which

Lortab, Flexeril, and a third drug were prescribed and various testing was to be scheduled. The final diagnosis was joint pain.  (Tr. p. 271).  The requested testing went forward on April 20, 2012.  (Tr. pp. 273-277).

Plaintiff returned to OMC-K on April 26, 2012 for follow-up care of pain to the back of her left knee, rated at a level of "8," along with limited flexion and extension.  Her vital signs were stable and Plaintiff was afebrile but there was mild swelling and limitation of motion to the left knee with no palpable mass.  The assessment was a past medical history of restless leg syndrome, vitamin D deficiency, and status post left total knee arthroplasty.  Plaintiff was prescribed Calcium Citracal and was to be scheduled for orthopedic and GI consultations as well as a mammogram.  (Tr. p. 272).

On May 7, 2012, Plaintiff was seen by Dr. Peter Krause of the Medical Center of Louisiana at New Orleans ("MCLNO").  Plaintiff reported no significant improvement following her knee replacement almost two years earlier and a continuing struggle with range of motion and pain to the affected joint.  Pain was worse with walking but there was no giving out or buckling.  Upon physical examination, there was some swelling around the left knee but no effusion was noted.  There was tenderness to palpation along the medial and lateral joint lines and some tenderness with range of motion, flexion, and extension.  Plaintiff could extend to approximately 5 degrees from full extension and could flex to about 70 degrees.  She was stable to varus and vagus stress with some tenderness but motor strength and sensation were intact distally.  X-rays that were taken at the time showed Plaintiff's left knee replacement to be in place with no lucency or evidence of hardware loosening.  Further testing was to be scheduled to rule out infection.  (Tr. pp. 307-309, 314).

Plaintiff presented to Nurse Practitioner ("NP") Mary Jo Broussard of the MCLNO Orthopedic Clinic on May 23, 2012 with complaints of ongoing left knee pain, reporting several steroid and Synvisc injections prior to arthroscopic surgical meniscal debridement in 2008 and 2009 followed by the total knee replacement in 2010. Plaintiff had also undergone manipulation under anesthesia approximately six to eight weeks post-operatively. She reported pain with weightbearing, at rest, and at night, localized to the medial, lateral, and posterior aspects of the knee, along with decreased sensation in the anterior leg above and below the incision and the medial side of the knee. Upon physical examination, Plaintiff was 10 degrees shy of full extension, active flexion was possible to 70 degrees, and passive flexion could be accomplished to 80 degrees before being limited by pain. Plaintiff's left knee was swollen with tenderness to palpation along the medial and lateral joint lines and she experienced pain with patellar compression, only on the side of the patella, and pain in the posterior knee with palpation. There was no ligamentous instability, the left calf was soft, and Plaintiff was neurovascularly intact distally. X-rays revealed questionable lucency surrounding the knee hardware. The assessment was two-year status post total left knee arthroplasty with chronic pain, swelling, and limited range of motion. Plaintiff was to weightbear as tolerated and was to return for further evaluation following a bone scan of the left knee. (Tr. pp. 310-312). That testing went forward on July 25, 2012 and produced findings consistent with osteomyelitis. (Tr. p. 315).

Plaintiff was seen at the Interim LSU Public Hospital on September 5, 2012 for her ongoing complaints of pain, worse with walking. There was some swelling around the left knee with no effusion and some tenderness with range of motion, flexion, and extension. Plaintiff could extend to 5 degrees from full extension and could flex to about 80 degrees.

She was stable to varus and valgus stress but did experience some tenderness with that maneuver.  Motor and sensation were intact distally.  X-rays were interpreted as showing the left knee replacement in place with no evidence of lucency or hardware loosening and the bone scan results were consistent with those findings.  Given the lack of findings consistent with infection, the attending physician, Dr. Ronald Rooney, commented that "unfortunately there is not an obvious explanation for [Plaintiff's] continued knee pain," a result that left her "unhappy and in distress."  Plaintiff was to return in six months.  (Tr. pp. 316-318).  Plaintiff's insured status for purposes of DIB coverage would subsequently expire on December 31, 2012.  (Tr. pp. 18, 20).

On January 7, 2013, Plaintiff was seen by Advanced Practice Registered Nurse ("APRN") Dawn Kaiser of the Daughters of Charity Services of New Orleans.  The chief complaint at the time was "pain, swelling, and immobility following right knee joint replacement in June 2010" that had never resolved.  Plaintiff reported a recent weight gain as pain and limited range of motion had prevented her from continuing with her previously active lifestyle.  Physical examination revealed the left knee to be tender to palpation at the lateral joint spaces with swelling.  The assessment was "[r]ight knee joint pain ... [r]eplacement of the right knee," allergic rhinitis, and postmenopausal atrophic vaginitis. APRN Kaiser explained to Plaintiff that unfortunately there was nothing that could be done for her knee.  Plaintiff was prescribed Naproxen, Tramadol, Estrogen Cream, and Etodolac; was referred for additional testing; and, was to return for follow-up in six months.  (Tr. pp. 284-287)(emphasis added).

Plaintiff returned to APRN Kaiser on January 23, 2013 and reported a reaction to the medications that had previously been prescribed.  Plaintiff's knee had become very swollen

and painful again in the previous three days and she also relayed a three-month history of discomfort with intercourse. The physical findings recorded on this date included none related to the musculoskeletal system. The assessment was allergic rhinitis and postmenopausal atrophic vaginitis. Plaintiff's medications were adjusted and further testing was to be scheduled. (Tr. pp. 282-284). She was next seen at the Interim LSU Public Hospital on March 11, 2013, relating a decreased range of motion but was elsewhere reported as being "... fairly unchanged from [the] last clinic appointment." There was no giving out or buckling, just difficulty with ambulation. No effusion to the left lower extremity was noted on physical examination but there was tenderness to palpation along both medial and lateral joint lines and tenderness with range of motion, flexion, and extension. Plaintiff could extend to approximately 5 degrees from full extension and could flex to about 70 degrees, up to 90 degrees with physician assistance and with pain. She was stable to varus and valgus stress but did experience some tenderness with such manipulation. The assessment was status post left total knee arthroplasty with no improvement and continued pain. Plaintiff was administered an injection of Lidocaine and Kenalog to the left knee, was to perform flexion and extension exercises at home to help with range of motion, and was to return in four to six months for further follow-up care. X-rays taken on this date revealed a small effusion but an otherwise uncomplicated appearance of the left knee. (Tr. pp. 319-321).

On June 14, 2013, Plaintiff was seen again by APRN Kaiser for complaints of knee pain and hot flashes and for medication refills. Plaintiff relayed that although she had some days that were tolerable, pain was triggered by normal walking or stair-climbing, resulting in severe discomfort and swelling that went on for days or even weeks. Plaintiff reported being compliant with her home exercise regimen but expressed frustration over the uncertain

etiology of her pain complaints.  In terms of knee symptoms, the treatment note documents no muscle aches or arthralgias but "[s]welling … and joint stiffness were localized to one or more joints."  The note also inconsistently reflects "[e]xercise program noncompliance." Upon physical examination, Plaintiff's knees showed abnormalities in the form of tenderness to palpation at the left knee lateral joint line and below the patella arteriorly along with mild swelling lateral to the patella.  A motor exam demonstrated no dysfunction and reflexes were normal.  The assessment was "[r]ight knee joint pain," postmenopausal atrophic vaginitis, hyperlipoproteinemia, and prediabetes.  Refills on Plaintiff's existing medications were given and she was additionally prescribed Omeprazole and Lisinopril.  Plaintiff was also counseled on prediabetes and cholesterol control diet and exercise, with an emphasis on swimming, and was recommended to take Glucosamine, Chondroitin, and MSM supplements.  (Tr. pp. 280-281)(emphasis added).

Plaintiff returned to the Daughters of Charity for a blood pressure check on June 28, 2013, this time being attended to by Registered Nurse ("RN") Grace Mena.  Plaintiff was taking her hypertension medication as directed but complained of an inability to afford the prescribed Estrogen Cream.  She was given some discount coupons and her medication list was reconciled.  (Tr. p. 279).  Plaintiff was next seen at the Interim LSU Public Hospital on July 8, 2013 for further follow-up care of her knee.  Pain and stiffness continued to be reported as was a history of night sweats and hot flashes.  There was a small effusion and general edema about Plaintiff's knee but no fluctuance or erythema.  She was stable to varus and valgus stress but pain was brought on with anterior stress.  No anteroposterior instability was noted.  Range of motion was 10 to 70 degrees.  X-rays revealed a lucent line at the posterior aspect of the femoral implant and possible loosening of the hardware.  The

assessment was left knee stiffness status post total knee arthroplasty.  Plaintiff's left knee was aspirated and the collected specimen was sent off for further evaluation.  (Tr. pp. 322-326, 350-353).  By July 22, 2013, Plaintiff reported two episodes of falling down during the previous month.  Like the most recent clinic visit, there was a small effusion and general edema surrounding Plaintiff's knee but no fluctuance or erythema.  Range of motion was 10 to 70 degrees actively and 5 to 75 degrees passively.  The assessment remained unchanged. As Plaintiff had obtained moderate relief for four to five weeks following her most recent intra-articular injection, a further injection was administered without issue after other treatment options were discussed.  (Tr. pp. 327-328, 348-349).

By correspondence dated August 7, 2013, Plaintiff's counsel provided the SSA Disability Examiner with an undated note from Dr. Rex Waggoner that was directed "To Whom It May Concern."  In that note, Dr. Waggoner recalled Plaintiff's "... history of knee surgery in the left knee" and her presentation to his clinic, the LSU Family Medicine-Ochsner, in January of 2012 with complaints of knee pain.  A physical examination that was performed at that time revealed mild swelling and a decreased range of motion.  Plaintiff had difficulty extending her knee past 160 degrees and flexing her leg past roughly 75 degrees with moderate pain to palpation in the posterior aspect of the knee but with no instability.  X-ray studies demonstrated a 1.5 mm hyperdensity at the hardware cement interface that was of unknown significance but alignment otherwise appeared intact with no fractures or dislocation.  Plaintiff reported pain when walking short distances or sitting too long that was best controlled by sitting with her legs elevated.  The use of NSAIDs was not particularly beneficial.  Plaintiff related significant difficulty with activities and felt that she was unable

to work at that time.  Another orthopedic surgeon was to be consulted for a second opinion. (Tr. pp. 329-330).

On October 21, 2013, Plaintiff was seen by Dr. Harry Molligan of the Interim LSU Public Hospital for continued complaints of left knee pain.  In the treatment note from that date, the doctor remarked that the intra-articular steroid injections that Plaintiff had recently received did "… provide her some benefit."  A physical examination of Plaintiff's left lower extremity revealed a well-healed midline incision and no erythema but there was moderate edema around the knee.  The joint line was tender to palpation and range of motion was capable from 5 to 60 degrees but with pain.  X-rays taken at the time demonstrated the hardware to be in place with no evidence of loosening or failure.  The assessment was a 53 year-old female with a painful knee three years status post total knee arthroplasty who had failed conservative therapies.  Plaintiff's situation was to be discussed at an upcoming physicians' conference for possible revision surgery and she was to continue NSAID therapy until her return in one month with weightbearing to be accomplished as tolerated.  (Tr. pp. 345-347).

On the same day as his evaluation of Plaintiff, Dr. Molligan completed a form letter that had been provided to him by Plaintiff's counsel which contained 12 "medical interrogatories" regarding her condition and whether it satisfied certain criteria of Listings 1.02 and 1.03 of the Listing of Impairments.  There, the doctor identified Plaintiff's diagnosis as left knee osteoarthritis status post total knee arthroplasty as demonstrated through x-ray studies with post-operative pain and decreased range of motion.  The prognosis was unknown but surgery was being discussed.  Plaintiff exhibited difficulty in ambulating secondary to knee flexion contracture and had limited range of motion, an antalgic gait,

moderate edema, and pain that resulted in significant limitations on her ability to ambulate and/or weightbear.  Dr. Molligan relayed Plaintiff's account of not being able to stand/walk comfortably for very long, perhaps 10 to 15 minutes.  Plaintiff further estimated that she could stand/walk off-and-on for approximately one hour in an eight-hour day.  In answer to the question as to whether it was reasonable to assume that Plaintiff would have to sit or lie down in a recumbent position and to elevate her lower extremities as a means of dealing with pain and/or inflammation at least two hours in an eight-hour day, Dr. Molligan wrote "unknown ... she can weight bear as tolerated ... ice and elevate as needed." (Tr. pp. 340-342).

Plaintiff returned to the Interim LSU Public Hospital on November 8, 2013, this time being evaluated by Dr. Karim Meijer.  Medications on this data included Flexeril, Lortab, Naprosyn, and Ultram for pain relief.  Range of motion was 5 to 75 degrees with pain.  X-rays showed appropriate alignment of the knee hardware but bone scan results were "[c]oncerning for osteomyelitis vs loosening of both components."  The treatment plan was unchanged.  (Tr. pp. 364-366).  Essentially the same findings were documented following Plaintiff's next evaluation by Dr. Meijer on March 31, 2014 and x-rays taken at that time revealed no evidence of hardware complication.  (Tr. pp. 359-363).

The final medical records that were admitted in the administrative proceedings below document Plaintiff's return visit to Dr. Molligan on April 28, 2014 for what was described as "[l]eft knee injury."  Physical examination findings were unchanged as was the assessment.  Because Plaintiff was on Medicaid at the time and because that clinic did not routinely handle revision surgeries, it was recommended that she reach out to her original surgeon or another joint specialist for further management options.  In the meantime,

Plaintiff was to continue with range of motion exercises and NSAID therapy as prescribed. Weightbearing was to be accomplished as tolerated.  (Tr. pp. 356-358).

As noted earlier, a hearing *de novo* before an ALJ went forward on May 28, 2014.  At the outset of the hearing, the ALJ recalled Plaintiff's previous application for Social Security benefits and observed that her insured status for purposes of DIB coverage had expired on December 31, 2012.  After the documentary exhibits were formally admitted into evidence, Plaintiff took the stand and was questioned by the ALJ.  She was 54 years of age at the time, had completed high school in addition to one year of college, and was able to drive.  Plaintiff testified to being followed at the Interim LSU Public Hospital during the relevant time period, without surgical intervention. primarily spending her time at home doing very little as a result of knee pain and swelling.  She had not attended any local festivals in a number of years as she once had.  (Tr. pp. 50-56).

Upon being tendered to her attorney for further questioning, Plaintiff testified that her treatment at LSU in 2012 was not particularly definitive or beneficial and that hardware failure and infection were viewed as possibilities following a bone scan.  At that time, Plaintiff testified that she suffered from swelling, chronic pain, and a tendency for her leg to give out. The pain was rated as anywhere from an "8" to a "10" on the sides and into the front.  Any activity, even standing or sitting, caused her knee to become swollen and throb and the joint always felt warm.  The only modality that provided any relief was sitting, elevating the leg, and applying ice to the affected area which Plaintiff testified that she did for "[a] couple [of] hours a day" in morning and evening stints.  A weightbearing x-ray of Plaintiff's left leg had been taken at some point in time which showed some type of hardware separation and she was ultimately treated with one or two injections.  Recently, Plaintiff's doctor at LSU had

advised her that revision surgery was necessary and thus referred her to a new doctor.  (Tr. pp. 56-60).

When asked why she was unable to work in March of 2012 and thereafter, even in a sedentary capacity, Plaintiff testified that she could not sit for any length of time and could not sit with her knee bent at a 90 degree angle.  Instead, she would have to keep her leg partially straight and would periodically have to stand up for a few minutes following which it would begin to swell.  Pain and swelling prevented Plaintiff from working a full eight-hour day and she would need the option to keep her leg elevated and iced.  Plaintiff could perhaps walk a block at a very slow pace and she was unable to attend sporting events or to go dancing as she once had, resulting in weight gain.  In 2012, Plaintiff had reportedly advised one of her doctors that she could not remain in a stationary position for prolonged periods of time but had to move her knee every 15 to 20 minutes to alleviate the throbbing.  Plaintiff testified that she had recently been evaluated by a new doctor who opined that revision surgery would be the best option for her.  Plaintiff could do light chores such as loading the dishwasher but was unable to push a vacuum cleaner.  In the previous year, Plaintiff's knee had given out on two occasions.  (Tr. pp. 60-62).

Upon further questioning by the ALJ, Plaintiff testified that it had been two to three years since it became necessary for her to elevate and ice her knee three to four hours per day.  Contrasted with that testimony, the ALJ pointed out that in the treatment records from the Daughters of Charity dated January 7, 2013, no mention was made of the need for Plaintiff to elevate and ice her knee for such extended periods of time.  In response, Plaintiff testified that she had repeatedly advised her doctors at Ochsner of such a need, that her LSU physicians had told her to keep her leg elevated, and that she had three different "ice

machines" that she used for that purpose.  In further support, counsel directed the ALJ to Dr. Waggoner's undated "To Whom It May Concern" letter where it was reported that Plaintiff's "… pain is best controlled when sitting with her legs elevated."  Counsel also argued that warmth and swelling of the knee were documented on five occasions in 2012 and that a bone scan ultimately revealed osteomyelitis or an infection of the bone itself.  The ALJ, however, questioned whether the documentary evidence established the existence of infection and he further questioned whether the revision surgery recommended in 2014 related back to the time period that Plaintiff was last insured for DIB purposes.  In response, counsel argued that given that there was evidence of infection dating back to 2012 and the consistency of Plaintiff's complaints thereafter, it was reasonable to assume that the revision surgery was recommended due to pathology that was present in 2012 while she was still insured. Counsel also pointed to a treatment note dated July 8, 2013 when Plaintiff's knee was aspirated and she was to return in two weeks for the lab results and "… further discussion of septic vs aseptic stiffness/loosening."  Counsel further argued that evidence that was generated after Plaintiff's insured status expired was relevant as long as it was related to an impairment that existed during the time that she was insured.  Counsel also discounted Dr. Rooney's September 5, 2012 conclusion that Plaintiff "… does not have findings consistent with infection" as an isolated incident that was contrary to the great weight of the evidence which showed a progressive worsening of her condition in the form of a failure of the surgical hardware and either an infection or deformity in the bone itself.  (Tr. pp. 62-73).

Plaintiff challenges the Commissioner's decision to deny her DIB on three grounds. First, Plaintiff argues that "[t]he ALJ applied an improper legal standard by refusing to consider any evidence prior to March 1, 2012 and after 12/1/12, Plaintiff's date last insured

(DLI)." (Rec. doc. 13-3, p. 2)(emphasis added).  Citing a statement made by the ALJ at the conclusion of an explanatory paragraph that appears on the second page of his written decision, Plaintiff further argues that the ALJ "… refused to consider any evidence after the DLI asserting:  'even if evidence covering the period after the expiration of the Claimant's DLI shows deterioration in the Claimant's condition, none of the evidence is material to the Claimant's condition before the insured status expired." (Tr. 21-22)." (*Id.* at p. 3).  This, Plaintiff contends, amounts to a misapplication of law as "[n]oncontemporaneous medical records are relevant to the determination of whether onset occurred on the date alleged by the Claimant" under the teachings of *Ivy v. Sullivan*, 898 F.2d 1045, 1049 (5th Cir. 1990).  (*Id.*).

Under 20 C.F.R. §404.1512(d), the Commissioner is charged with developing the medical history of a DIB claimant "… for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary…."  As Plaintiff filed her application for DIB in May of 2013, the Commissioner would normally be obligated to develop Plaintiff's medical history going back to April of 2012.  However, because Plaintiff alleged an onset date of March 1, 2012, development of her medical history going back to that earlier date was warranted.  Further augmenting the ALJ's decision to use March 1, 2012 as the starting date for the relevant time period was, as discussed earlier, the administrative *res judicata* effect flowing from Plaintiff's previous application for DIB was denied by an ALJ on that very date.  (*See* pp. 5-6, *supra*).

Having properly determined the starting date of the relevant time period, the ALJ was next required to arrive at an end date for that period in discharging his duty, at step one of the §404.1520 analysis, of ascertaining whether Plaintiff engaged in substantial gainful activity during that time frame.  In that regard, the ALJ opined as follows:

At the outset, the undersigned restates what is plain in every instance where a claimant files for benefits under Title II of the Social Security Act:   In order to be eligible for disability insurance benefits under Title II, a claimant must establish that she became disabled on or prior to the expiration of her insured status.  Here, the claimant's disability insured status expired on December 31, 2012.  Accordingly, the claimant must prove that she became disabled on or prior to that date.

It is significant to note that a substantial portion of the evidence submitted in support of the claimant's application was already submitted with the prior application and was found to show that the claimant was not disabled.  (See Decision of administrative Law Judge Christopher H. Juge dated March 1, 2012).  The March Decision undertook an exhaustive analysis of the medical evidence and unequivocally shows that the evidence from March 14, 2009, through the date of that decision (documenting the claimant's total knee replacement and surgical sequelae) supports a conclusion that the claimant was not disabled. Accordingly, the undersigned has evaluated the claimant's complaints of pain in light of the evidence from March 1, 2012 through her date last insured of December 31, 2012.

(Tr. p. 20).

Because Plaintiff's Title II insured status expired on December 31, 2012, she bore the

burden of establishing that she became disabled on or before that date to be eligible for

benefits.  *McLendon v. Barnhart*, 184 Fed.Appx. 430, 431 (5th Cir. 2006)(citing *Ivy*, 898 F.2d

at 1048).  As made clear by the Fifth Circuit panel in *McClendon*:

The mere presence of an impairment does not necessarily establish a disability.   If a claimant has a degenerative or ongoing impairment, the relevant inquiry is whether the claimant was actually disabled during the relevant time, not whether a disease existed that ultimately progressed to a disabling condition.   Evidence showing a degeneration of a claimant's condition after the expiration of his [or her] Title II insured status is not relevant to the Commissioner's Title II disability analysis.  *See Torres v. Shalala*, 48 F.3d 887, 894 n. 12 (5th Cir. 1995).

*McClendon*, 184 Fed.Appx. at 431.

19

Plaintiff cites *Ivy* for the proposition that "[s]ubsequent medical evidence is relevant ... because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status."  (Rec. doc. 13-3, p. 3)(quoting *Ivy*, 898 F.2d at 1049).  As various courts have noted, however, *Ivy* is distinguishable from matters like the one at hand because it involved a situation in which previously available medical records had been lost or destroyed and had to be reconstructed by relying upon lay testimony.  *Brock v. Shalala*, 9 F.3d 104 (5th Cir. 1993); *Leval v. Comm. of Soc. Sec.*, No. 11-CV-0001, 2012 WL 1123839 at *4 (W.D. La. Mar. 13, 2012), *adopted*, 2012 WL 1123835 (W.D. La. Apr. 3, 2012); *Swaingan v. Astrue*, No. 10-CV-1118, 2011 WL 1596203 at *11 (E.D. La. Mar. 23, 2011), *adopted*, 2011 WL 1597529 (E.D. La. Apr. 27, 2011).  Plaintiff's reliance on Social Security Ruling ("SSR") 83-20 is also misplaced, as that "... rule does not pertain to records subsequent to the date last insured."  *Leval*, 2012 WL 1123839 at *4 (citing *Torres v. Shalala*, 48 F.3d 887, 894 n. 12 (5th Cir. 1995) and *Dominguez v. Astrue*, 286 Fed.Appx. 182, 185 (5th Cir. 2008)).  With respect to such records, the Fifth Circuit instructs that "[w]hile a retrospective opinion can prove the existence of a disability, the retrospective opinion must refer clearly to the relevant period of disability and not simply express an opinion to the claimant's current status.  Records describing a claimant's current condition cannot be used to support a retrospective diagnosis of disability absent evidence of an actual disability during the time of insured status."  *McLendon*, 184 Fed.Appx. at 432.

Against the backdrop of the foregoing standards, the Court turns to the medical evidence that was generated during the relevant time period and thereafter to determine whether Plaintiff did indeed suffer from a disabling condition during the time that she was insured or whether she experienced a subsequent deterioration of a previously non-

disabling condition.  Before doing so, contrary to Plaintiff's present assertion, a review of the ALJ's decision reveals that he did, in fact, consider at least some evidence that was generated subsequent to the expiration of Plaintiff's insured status on December 31, 2012.  That evidence takes the form of the testimony adduced at the administrative hearing, testimony that covered treatment and symptomology both during and subsequent to the relevant time period, as well as the "medical interrogatories" that were answered by Dr. Molligan on October 21, 2013.  (Tr. pp. 21-23).  That having been said, during the relevant time period, Plaintiff was evaluated by a physician on four occasions, was seen by a nurse practitioner on another occasion, and also underwent a bone scan in the interim.  On the first such physician evaluation, Plaintiff was diagnosed with joint pain and was prescribed Lortab, Flexeril, and a third drug.  On the second occasion, a physical examination revealed mild swelling and a reduced range of motion but no palpable mass.  The assessment on that date, presumably in a descending order of significance, was a past medical history of restless leg syndrome, vitamin D deficiency, and status post left total knee arthroplasty.  Plaintiff was prescribed a calcium supplement and further evaluations and testing were to be arranged.  On neither of these two occasions did the examining physicians place any limitations upon Plaintiff's activities, a proper consideration in a Social Security proceeding.  *Leggett v. Chater*, 67 F.3d 558, 565 (5th Cir. 1995); *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1989).

Plaintiff's third evaluation during the relevant time period occurred with Dr. Krause of MCLNO on May 7, 2012.  Although Plaintiff complained of increased pain with walking, there was no buckling or giving out of the joint.  Physical examination revealed some swelling but no effusion and some tenderness to palpation and with range of motion but motor strength and sensation were intact.  X-rays demonstrated no lucency or hardware loosening.

Further testing was to be scheduled to rule out infection but once again, no limitations were placed on Plaintiff's activities.  Plaintiff's fourth evaluation was conducted by NP Broussard on May 23, 2012 who is not considered to be an "acceptable medical source" under the Social Security Regulations.  20 C.F.R. §404.1513(a) and (d); *Boudreaux v. Soc. Sec. Admin.*, No. 13-CV-4949, 2014 WL 7339022 at *2 (E.D. La. Dec. 19, 2014).  The chief complaint at the time was ongoing left knee pain.  Upon physical examination, there was swelling to Plaintiff's left knee with tenderness to palpation along the medical and lateral lines and with patellar compression but there was no ligamentous instability.  The assessment was status post left total knee arthroplasty with chronic pain, swelling, and reduced range of motion.  Plaintiff was to weightbear as tolerated and a bone scan was to be scheduled.  That testing went forward at MCLNO on July 25, 2012 and produced results consistent with osteomyelitis.

Plaintiff's final physician evaluation during the relevant time period was performed by Dr. Rooney of the Interim LSU Hospital on September 9, 2012.  The chief complaint at the time was ongoing pain, worse with walking.  Physical examination revealed some swelling, but no effusion, and some tenderness with range of motion, flexion, and extension but motor strength and sensation were intact.  X-rays showed no lucency or hardware loosening.  Dr. Rooney interpreted the bone scan results as demonstrating "… changes consistent with prior knee replacement" and opined that Plaintiff "d[id] not have findings consistent with infection."  (Tr. p. 317).  Unfortunately, there was no obvious explanation for Plaintiff's continued complaints of pain and she was to therefore return for follow-up care in six months.  No specific treatment plan appears in the records from this date, nor were any restrictions placed upon Plaintiff's activities.  At no time during the relevant time period did any of Plaintiff's treating physicians make a specific pronouncement that she was disabled.

*Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)(citing *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989)).  Plaintiff's insured status for purposes of DIB expired on December 31, 2012.

Among the evidence that was subsequently generated and filed in the proceedings below was correspondence from Plaintiff's counsel dated August 7, 2013, which included an undated "To Whom It May Concern" letter from Dr. Waggoner in which he recalled Plaintiff's presentation to and evaluation by him in January of 2012.  That evaluation took place before the relevant time period at issue in this case and the results of it were duly considered by the ALJ who adjudicated Plaintiff's previous application for DIB.  (Tr. p. 42).  Be that as it may, the record in this case does contain a copy of the contemporaneous treatment note of January 30, 2012 which identifies the attending physician as Dr. Shannon Starr with Dr. Waggoner being present as the observing resident.  (Tr. p. 269).  Physical examination findings at the time were decreased range of motion in the left knee and pain with active and passive range of motion, for which Plaintiff was taking Ibuprofen, findings that were largely consistent with those that were recorded throughout the relevant time period in this case.  Unlike Plaintiff, the Court does not read the record as documenting a marked worsening of her condition in the early part of 2012.  (Rec. doc. 13-3, p. 3).  In fact, the medical records described in greater detail earlier show that Plaintiff's condition remained essentially unchanged past the expiration of her insured status and into 2013 and not until July 22, 2013 did she report recent instances of functional difficulties such as her knee giving out.  More importantly, with the possible exception of Dr. Waggoner, none of the medical records that were generated subsequent to the expiration of Plaintiff's insured status contain "… retrospective opinion[s] … refer[ing] clearly to the relevant period of disability and not simply … an opinion [as] to

the claimant's current status" as the jurisprudence requires. *McClendon*, 184 Fed.Appx. at

432; *Swaingan*, 2011 WL 1596203 at *11. This challenge is without merit.

In her second challenge to the Commissioner's decision, Plaintiff argues that the ALJ

applied an improper legal standard by failing to properly consider whether her condition

met or equaled the criteria of Listings 1.02 and 1.03 of the Listing of Impairments and that

his step-three analysis under §404.1520 included gross misstatements of fact and relied on

irrelevant facts as well as the "conclusory" opinion of Dr. Rooney. Plaintiff also reiterates her

earlier complaint that the ALJ failed to consider any evidence subsequent to the date that she

was last insured and that the ALJ improperly characterized the evidence that he did consider.

In finding that Plaintiff did not suffer from a listed impairment at the third step of the

§404.1520 sequential analysis, the ALJ reasoned as follows:

> In accordance with *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007),
> the undersigned has considered the impairments listed in
> Appendix 1 to Subpart P of Part 404 of the Regulations and finds
> that the claimant's impairments do not singly or in combination
> meet or medically equal the required criteria for any of the
> impairments listed under section 1.01, Category of
> Impairments, Musculoskeletal, including listings, 1.02, 1.03,
> [r]econstructive surgery or surgical arthrodesis of a major
> weight-bearing joint, or any other listed impairment. The signs,
> symptoms, and history of treatment presented in the evidence
> of record are inconsistent with any impairment(s) of listing-
> level severity. The medical evidence discussed below plainly
> establishes that the effects of the claimant's left total knee
> replacement did not approximate listing level severity during
> the relevant period.
>
> Initially, the undersigned notes that there was no medical
> evidence of persistent, marked limitation of motion or abnormal
> motion of any weight-bearing joint before the expiration of the
> claimant's date last insured. As early as two months after the
> alleged onset date, the claimant had nearly normal right knee
> flexion, with otherwise normal motor and sensation other than
> tenderness with manipulation (Ex. B6F/2.) Furthermore, x-ray
> examination of the claimant's left knee showed no evidence of

lucency or hardware looseing.  (Ex. B6F/2, 8.)  A three-phase bone scan obtained July 25, 2012, was interpreted as "consistent with osteomyelitis of the left knee."  (Ex. B6F9.)  By September 2012, however, the claimant's treating physician at Ochsner reported difficulty with ambulation, but "no buckling."  (Ex. B6F/10.)   There was some "swelling" around the knee on physical examination, but "no effusion" and the claimant remained neurologically intact.  Significantly, at that time, Dr. Rooney found *no evidence consistent with infection* (Emphasis added.)(Ex. B6F11.)  This evidence overwhelmingly suggests that the claimant did not meet or equal listing 1.03.

Further, even if evidence covering the period after the expiration of the claimant's date last insured shows deterioration in the claimant's condition, none of the evidence is material to claimant's condition before the insured status expired.  Notably, Exhibit B12F is a one page barely legible form completed by Dr. Ellinger (sic), almost one year after the expiration of the claimant's date last insured.   Nothing in exhibits during the relevant period reflects any treatment with Dr. Ellinger (sic), or any contemporaneous treatment notes corroborating the limitations mentioned in that report.  Moreover, even if such evidence did exist to corroborate the October 2013 report, the report, itself, would not be probative in finding the claimant disabled on or before December 31, 2012.

(Tr. pp. 21-22).

As the foregoing discussion makes clear, in accordance with the teachings of *Audler*, 501 F.3d at 448, the ALJ in the present case duly identified the particular listings for which Plaintiff's symptoms failed to quality <u>and</u> also provided an explanation as to how he made that determination.  Admittedly, the ALJ in the final paragraph of his explanation erroneously referred to Dr. Molligan as "Dr. Ellinger" and indicated that the medical interrogatory form that the doctor completed on October 21, 2013 was one rather than four pages.  However, the ALJ was correct in observing that Dr. Molligan did not treat Plaintiff during the relevant time period and that the findings that he made in October of 2013 did not relate back to the relevant time period.  Plaintiff nevertheless argues that her condition satisfied the criteria of

Listings 1.02(A) and 1.03 of the Listing of Impairments.  Those Listings provide that a

claimant will be considered presumptively disabled if he or she suffers from:

> 1.02 *Major dysfunction of a joint(s) (due to any cause)*:
> Characterized by gross anatomical deformity (e.g., subluxation,
> contracture, bony or fibrous ankylosis, instability) and chronic
> joint pain and stiffness with signs of limitation of motion or
> other abnormal motion of the affected joint(s), and findings on
> appropriate medically acceptable imaging of joint space
> narrowing, bony destruction, or ankylosis of the affected
> joint(s).
> With:
>> A. Involvement of one major peripheral weight-bearing joint
>> (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate
>> effectively, as defined in 1.00B2b;
>
> * * * * * *
>
> 1.03 *Reconstructive surgery or surgical arthrodesis of a major
> weight-bearing joint*, with inability to ambulate effectively, as
> defined in 1.00B2b, and return to effective ambulation did not
> occur, or is not expected to occur, within 12 months of onset.

As can be seen, common to both of the above-listed musculoskeletal impairments is

the inability to ambulate effectively, with that inability having lasted, or being expected to

last, for 12 continuous months from the date of onset.  *See also* 20 C.F.R. Pt. 404, Pt. 404,

Subpt. P, App. 1, Listing 1.00(B)(2)(a).  The Regulations define an "[i]nability to ambulate

effectively" as " . . . an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that

interferes very seriously with the individual's ability to independently initiate, sustain, or

complete activities.  Ineffective ambulation is defined generally as having insufficient lower

extremity functioning . . . to permit independent ambulation without the use of a hand-held

assistive device(s) that limits the functioning of both upper extremities."  20 C.F.R. Pt. 404,

Subpt. P, App. 1, Listing 1.00(B)(2)(b)(1).  The Regulations further provide that "*[t]o

ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace

over a sufficient distance to be able to carry out activities of daily living."  20 C.F.R. Pt. 404,
Subpt. P, App. 1, Listing 1.00(B)(2)(b)(2).  Examples of ineffective ambulation include, but
are not limited to, the following:

> the inability to walk without the use of a walker, two crutches
> or two canes, the inability to walk a block at a reasonable pace
> on rough or uneven surfaces, the inability to use standard public
> transportation, the inability to carry out routine ambulatory
> activities, such as shopping and banking, and the inability to
> climb a few steps at a reasonable pace with the use of a single
> hand rail.  The ability to walk independently about one's home
> without the use of assistive devices does not, in and of itself,
> constitute effective ambulation.

> (*Id.*).

As this is a third-step inquiry under §404.1520, it is the claimant who bears the
burden of proving that her impairment or combination of impairments meets or equals a
listing.  *Crowley v. Apfel*, 197 F.3d 194, 198 (5th Cir. 1999).  "For a claimant to show that his
[or her] impairment matches a listing, it must meet <u>all</u> of the specified medical criteria.  An
impairment that manifests only some of those criteria, no matter how severely, does not
qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990)(footnote omitted).

In light of the deferential standard of review applicable to Social Security proceedings
and based upon a review of the administrative record below, the Court believes that
substantial evidence exists to support the ALJ's finding that Plaintiff did not meet the
requirements of Listings 1.02(A) and 1.03.  As respects Listing 1.02(A), at no time during the
relevant time period was Plaintiff diagnosed with subluxation, contracture, bony or fibrous
ankyloses, or instability as that Listing requires.  *See*, *e.g.*, *Bullock v. Astrue*, 277 Fed.Appx.
325, 328 (5th Cir. 2007).  The first mention that was made of any of those conditions was Dr.
Molligan's reference to contracture in the medical interrogatories that he answered on

October 21, 2013, which falls outside the relevant time period, even though his contemporaneous treatment note from that date contains no such diagnosis.

For purposes of Listing 1.03, the Court is cited to no authority that equates a knee replacement with "reconstructive surgery or surgical arthrodesis" and it is undisputed that Plaintiff did not undergo any surgical procedures during the relevant time period.  Even if Plaintiff otherwise met the requirements of Listings 1.02(A) and/or 1.03, she would <u>also</u> have to show that she was unable to ambulate effectively during the period at issue which she cannot do as there is no evidence that she required a walker, two crutches, or two canes. *Id.*  At no time during the relevant time period did an examining source document any ambulatory abnormalities in gait or station.  Motor strength and sensation were found to be normal on May 7 and September 5, 2012 and no ligamentous instability was noted on May 23, 2012.  The absence of any more significant findings may properly be considered by an ALJ in adjudicating a claimant's disability status. *Clayborne v. Astrue*, 260 Fed.Appx. 735, 737 (5th Cir. 2008); *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987).  Simply put, the record contains insufficient <u>objective</u> evidence of an inability to ambulate effectively during the relevant time period, absent which the requirements of Listings 1.02(A) and 1.03 are not met. *Jackson v. Colvin*, No. 14-CV-2044, 2015 WL 9181101 at *12 (E.D. La. Oct. 26, 2015), *adopted*, 2015 WL 8993976 (E.D. La. Dec. 16, 2015)(citing *Malta v. Astrue*, No. 10-CV-1320, 2010 WL 5139497 at *8-9 (N.D. Tex. Dec. 17, 2010)).  As for Plaintiff's attempt to characterize the results of the July 25, 2012 bone scan as demonstrating a "photopenic defect" that was the equivalent of a "bony deformity," in fairness the radiologist's finding in full was a "... persistent increased uptake on all 3 phases at the left knee with a photopenic defect <u>consistent with the patient's total joint replacement</u>."  (Tr. p. 315)(emphasis added).  Based

upon those findings <u>and</u> the results of bloodwork, x-rays, and a physical examination, Dr. Rooney subsequently opined that "[t]his patient does not have findings consistent with infection." (Tr. p. 316-317).  Unlike Plaintiff, the Court is unable to view this evidence from one of her own treating physicians as "conclusory" or "conjecture."

Plaintiff's third and final challenge to the Commissioner's decision is that the ALJ improperly discredited her testimony regarding her non-exertional limitations resulting from pain and swelling.

The law is clear that an ALJ must consider a claimant's subjective complaints of pain and other limitations.  *Scharlow v. Schweiker*, 655 F.2d 645, 648 (5th Cir. 1981).  However, it is within the ALJ's discretion to determine their debilitating nature.  *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987).  Pain is considered disabling under the Social Security Act only when it is "... constant, unremitting, and wholly unresponsive to therapeutic treatment" and the mere existence of pain or the fact that an individual is unable to work without experiencing some pain or discomfort does not qualify.  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983). The burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989).  The ALJ must then weigh the plaintiff's subjective testimony against the objective medical evidence that has been produced.  *Chaparro*, 815 F.2d at 1010 (citing *Jones*, 702 F.2d at 621 n. 4).  An ALJ may discredit a plaintiff's subjective complaints of pain and other limitations if he carefully weighs the objective evidence and articulates his reasons for doing so.  *Anderson v. Sullivan*, 887 F.2d 630, 633 (5th Cir. 1989)(citing *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988)).  It must be remembered that the evaluation of a plaintiff's

subjective complaints is a task particularly within the province of the ALJ, for it was the ALJ who had an opportunity to observe the plaintiff, not the reviewing court. *Harrell*, 862 F.2d at 480. In the final analysis, the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance. *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991); *Greigo v. Sullivan*, 940 F.2d, 942, 945 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 129 (5th Cir. 1991); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

In the matter at hand, the ALJ found Plaintiff's testimony of disabling pain during the relevant time period to be less than credible because it lacked sufficient objective support. As discussed more thoroughly earlier, Plaintiff was evaluated by a physician or an NP on five occasions during the relevant time frame of just over nine months. On only one of those occasions, March 21, 2012, was Plaintiff prescribed pain medication in the form of Lortab, Flexeril, and possibly a third drug. "A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received only minimal medical treatment and/or has taken only occasional pain and medication." *Francois v. Comm. of Soc. Sec.*, 158 F.Supp. 2d 748, 765 (E.D. La. 2001). *See also Villa*, 895 F.2d at 1024. On the second occasion, April 26, 2012, Plaintiff was prescribed only a vitamin supplement and the diagnosis was a past medical history of restless leg syndrome, followed by vitamin D deficiency, followed by status post left total knee arthroplasty. On none of the other three occasions was any specific treatment rendered to Plaintiff at all. "Medical factors which indicate disabling pain include: limitation of range of motion, muscle atrophy, strength deficits, sensory deficits, reflex deficits, weight loss or impairment of general nutrition, noticeable swelling, and muscle spasm." *Francois*, 158 F.Supp. 2d at 763. Although Plaintiff undoubtedly had mild swelling

and slight limitation of motion on all five occasions that she was evaluated during the relevant time period, on balance the findings do not point to disabling pain as there was no evidence of muscle atrophy; strength, sensory, or reflex deficits; weight loss or impairment of general nutrition; or, muscle spasm.  On none of those five occasions did any of the five examiners place any limitations on Plaintiff's activities, *Leggett*, 67 F.3d at 565, much less pronounce that Plaintiff was disabled.   *Vaughn*, 58 F.3d 131.   A claimant's subjective complaints must be supported by the objective evidence of record.  *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994); *Augustine v. Barnhart*, No. 01-CV-2685, 2002 WL 927797 at *4 (E.D. La. May 7, 2002); *Collins v. Callahan*, No. 96-CV-3546, 1993 WL 118082 at *3-4 (E.D. La. Mar. 17, 1998).  In light of the evidence pertaining to the relevant time period that was before him, both objective and subjective, the ALJ properly assessed the effect of Plaintiff's pain on her ability to work.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such

consequences will result from a failure to object.  *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).[2/]

New Orleans, Louisiana, this __23rd__ day of _____ December _____, 2016.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE

---

[2/] *Douglass* referenced the previously-applicable 10-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to 14 days.